UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 11-65-DLB-JGW

JORDAN BERNARD                                                          PLAINTIFF

vs.                        MEMORANDUM OPINION AND ORDER

NORTHERN KENTUCKY UNIVERSITY, ET AL.                  DEFENDANTS

* * * * * * * * * * * * * * * * *

Plaintiff Jordan Bernard brings this civil action against Defendants Northern
Kentucky University ("NKU"), the NKU Board of Regents, James Votruba in his official
capacity as President of NKU, Zebulun Davenport in his official capacity as Vice President
of NKU, Lisa Rhine in her official capacity as Assistant Vice President of NKU, as well as
Jeffrey Waple, Dean of Students, Steve Meier, Associate to the Dean, Barbara Sween, Lisa
Besnoy, and Harold Todd, Directors, four Jane Does, employees of NKU,[1] and two John
Does, members of the NKU Police Department,[2] all in their official and individual capacities.
Plaintiff alleges federal claims pursuant to §§ 1983 and 1985(3), as well as various state-
law tort claims.[3]  The claims brought against each of the Defendants relate to the April 7,

---

[1]  These individuals have been identified by Plaintiff as Lisa Barresi, as named in the Official Report of Sergeant Willie B. Love (Doc. # 10-2 at 4), and individual Defendants already named.

[2]  These two Defendants have been identified by Defendants as Sergeant Willie B. Love and Officer Nutini (*See* Doc. # 10-2 at 3), and confirmed as such by Plaintiff.

[3]  In his Amended Complaint, Plaintiff alleges six counts as follows: (1) pursuant to 42 U.S.C. § 1983 for violation of Plaintiff's constitutional, due process, and statutory rights; (2) conspiracy to deprive Plaintiff of his constitutional, due process, and statutory rights; (3) intentional infliction of emotional distress; (4) negligent infliction of emotional distress; (5) false imprisonment; and (6) violation of Plaintiff's Fifth and Fourteenth

2010 observation and questioning of Plaintiff in a testing room on the NKU campus, and his subsequent suspension.  The Court has federal question jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367.

This matter is before the Court on Defendants' Motion for Summary Judgment or, in the Alternative, Motion for More Definite Statement (Doc. # 10).  The Motion has been fully briefed (Docs. # 11, 12), and is now ripe for review.  On April 18, 2012, the Court conducted oral argument on the Motion.  Marianne Chevalier appeared on behalf of Plaintiff, who was not present; Michael Hawkins, Andrew Millar, and Kathleen Carnes appeared on behalf of Defendants.  The proceedings were recorded by Official Court Reporter Lisa Wiesman.  For the reasons set forth below, Defendants' Motion for Summary Judgment is **granted**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jordan Bernard was a freshman at NKU during the 2009-2010 school year. Because of his individual needs, he was provided with an individual testing room to complete exams through the NKU Testing and Disabilities Services ("TDS") department. (Doc. # 9 at 6).  On April 7, 2010, Plaintiff was using a TDS testing room and alleges that during the course of taking his exam, an unknown female employee in the TDS office removed the test from him and took it out of the room.  Plaintiff asserts that after his test was taken, two officers from the Department for Public Safety at NKU and four employees of TDS "entered the testing room and began interrogating the Plaintiff regarding his mood." (*Id.*).  Plaintiff states that he was "physically prevented from leaving the testing room . . .

_____

Amendment due process rights.

2

for nearly two hours," and further alleges that he was not allowed to use the restroom unaccompanied. (*Id.* at 6-7). Plaintiff additionally states that one of the TDS employees "falsely informed" him that his mother had been telephoned, and that he "became increasingly concerned and worried when his mother did not arrive." (*Id.* at 7).

According to the report of Defendant NKU Police Sergeant Willie B. Love (Doc. # 10-2 at 3-5), which Defendants attached to their Motion, Sgt. Love received a call from TDS stating that an NKU student may be under the influence of a controlled substance. (*Id.* at 3). Sgt. Love and Officer Nutini responded, and met Ms. Lisa Besnoy, Director of the NKU Testing and Disability Center, upon their arrival. Ms. Besnoy informed them that Plaintiff was exhibiting abnormal behavior, including inability to focus, slowed movements, and "slowly reaching in the air as if he was trying to catch something." (*Id.*). Ms. Besnoy stated that during her previous contact with Plaintiff, he had always appeared "pleasant and alert." (*Id.*). Sgt. Love observed Plaintiff's behavior in the testing room through a closed-circuit television ("CCTV") system for approximately fifteen to twenty minutes, confirming that his movements were slow, that he seemed unable to focus, and that he "would consistently cover his face with his hands." (*Id.*).

Upon entering the testing room, Sgt. Love began to question Plaintiff, asking if he was feeling "OK" and whether he was using any prescription or illegal drugs, and informed him that his behavior did not appear to be normal. Plaintiff responded that he was not taking any drugs, but that "he was upset about the negative reputation of Kentucky," which he attributed in part to "Hillbillies." (Doc. # 10-2 at 3-4). Plaintiff also mentioned that families have "issues and problems," but offered no further clarification, nor any indication whether his own family had such issues. (*Id.* at 4). Sgt. Love reported that Plaintiff "could

3

not stay focused" during their conversation, and that he "could not remember the questions asked and was unable to finish his statements." (*Id.*). Sgt. Love informed Plaintiff that he was there to help, but that in order to help he needed to know why Plaintiff was behaving abnormally. Plaintiff responded "'wait 3 weeks and then come talk to me.'" (*Id.*). When asked what he meant by that, Plaintiff responded only by saying, "'Clarity.'" (*Id.*).

After this interaction, Sgt. Love contacted Dean of Students Jeffrey Waple and Lisa Barresi from NKU's Health and Counseling Services "to respond, inform and further evaluate the situation." (Doc. # 10-2 at 4). Ms. Barresi and Ms. Besnoy spoke with Plaintiff and determined that he may have some mental health issues that needed to be addressed. Sgt. Love stated that it was at this time that "an attempt to contact his mother was made." (*Id.*). Sgt. Love reported that Plaintiff's mother informed him during their conversation that Plaintiff had seen a counselor for his behavior, and that he was prescribed medication for certain mental health issues. She also stated "that she has noticed a recent change in his behavior as well," and agreed to pick Plaintiff up from TDS and escort him home. (*Id.*).

Sgt. Love's report asserts that Plaintiff's mother was informed, both via telephone and again upon her arrival, that Plaintiff was suspended from NKU until certain issues regarding his mental health were addressed. (Doc. # 10-2 at 4). When Plaintiff's mother arrived, she received a formal written letter signed by Dean Waple notifying Plaintiff that he was required to obtain a mental health evaluation and release the results to NKU, and that he was being placed on interim suspension from NKU pending the results of an investigation. (*See* Docs. # 9 at 7; 10-2 at 6-7). The letter cited the Student Code provisions Plaintiff was charged with violating, and outlined the procedure for a formal administrative meeting to take place upon receipt of the results of Plaintiff's mental health

4

evaluation pursuant to the guidelines for hearings set forth in the Code of Student Rights and Responsibilities.  (Doc. # 10-2 at 6-7).  Plaintiff was seen by his treating psychologist, Dr. Steve Hoersting, the following day, and Dr. Hoersting submitted a report detailing the results of his evaluation to Dean Waple on April 9, 2012.  (Ex. 1).  Plaintiff and Defendants confirmed at oral argument that upon receipt of this report, two days after the imposition of interim suspension, Dean Waple invited Plaintiff Bernard to come speak with him, whereupon the suspension would be lifted.

Plaintiff alleges that he was hospitalized on April 9, 2010 "due to severe emotional distress resulting from the events of April 7, 2010 [and] remained hospitalized for twenty eight (28) days."  (Doc. # 9 at 7).  Plaintiff further asserts that he was "forced to withdraw from his semester classes, experienced a loss of state and federal financial aid, and incurred expenses related to his medical treatment."  (*Id.*).

## II.  ANALYSIS

### A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The

moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.      Plaintiff's Claims Against NKU, the NKU Board of Regents, and Individual Defendants in their Official Capacities are Barred by the Eleventh Amendment**

Defendants assert that summary judgment is appropriate on Plaintiff's claims against NKU, the NKU Board of Regents, and the individual Defendants in their official capacities because these claims are barred by the immunity granted under the Eleventh Amendment to the United States Constitution. (Doc. # 10-1 at 7). Plaintiff did not respond to this assertion in his written submissions, but conceded at oral argument that the Eleventh Amendment bars his claims against these Defendants. Having considered Defendants'

6

argument and the supporting case law, Plaintiff's concession is well taken and his claims against NKU, the NKU Board of Regents, and the individual Defendants in their official capacities are barred by the immunity provided by the Eleventh Amendment.

It is well established that the Eleventh Amendment "bars all suits . . . against the state and its departments by . . . its own citizens."  *Thiokol Corp. v. Dep't of Treas., Rev. Div.*, 987 F.2d 376, 381 (6th Cir. 1993) (internal citations omitted); *see Quern v. Jordan*, 440 U.S. 332, 337 (1979) (holding that "a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment").  This jurisdictional bar extends to "suits for monetary relief against state officials sued in their official capacity."  *Id.*; *see Cady v. Arenac Cnty.*, 574 F.3d 334, 344 (6th Cir. 2009) (recognizing an exception to Eleventh Amendment immunity "if an official-capacity suit seeks only prospective injunctive or declaratory relief").

There are only two circumstances in which the application of Eleventh Amendment immunity is improper on a claim for monetary damages: (1) where a state has waived its immunity from federal suit, and (2) where Congress abrogates that immunity through statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984) (stating that a "sovereign's immunity may be waived," but noting the requirement "that the State's consent be unequivocally expressed"); *Thiokol Corp.*, 987 F.2d at 381 ("'Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.'") (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)).  "Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, . . . a State cannot be sued directly in its own name regardless of the relief sought."  *Kentucky v.*

*Graham*, 473 U.S. 159, 167 n.14 (1985).

The parties do not dispute that NKU is an agency of the state entitled to the protections of the Eleventh Amendment. Absent a stated exception, the Eleventh Amendment will bar Plaintiff's federal claims against NKU, the NKU Board of Regents, and Defendants in their official capacities.

### 1.    Federal Claims

Defendants argue that Plaintiff's federal claims, brought pursuant to 42 U.S.C. §§ 1983 and 1985, are also barred by Eleventh Amendment immunity.[4]  "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 71 (1989) (holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983").  The Sixth Circuit has clearly stated that "[t]he Eleventh Amendment bars § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages." *Cady*, 574 F.3d at 342 (citing *Graham*, 473 U.S. at 169 n.17).

Neither exception to the application of Eleventh Amendment immunity is applicable here.  Kentucky has not waived its sovereign immunity, *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008), nor has Congress abrogated this immunity through statute.  *Will v. Mich.*, 491 U.S. at 66 (reaffirming the "clear" holding of the Supreme Court in *Quern* that

---

[4] Count VI of the Amended Complaint, alleging violations of Plaintiff's 5th and 14th Amendment due process rights, will be analyzed here as brought pursuant to § 1983, as these amendments, in and of themselves, do not create a private right of action.  *See Butz v. Economou*, 438 U.S. 478, 526 (1978) (Rehnquist, J., concurring in part and dissenting in part) (noting that "the Court has not held that the Constitution itself creates a private right of action for damages except when federal law enforcement officials arrest someone and search his premises in violation of the Fourth Amendment").

"in passing § 1983, [Congress] had no intention to disturb the States' Eleventh Amendment immunity") (citing *Quern v. Jordan*, 440 U.S. 332 (1979)).  Simply put, "section 1983 claims are not cognizable against a state or its agents acting in their official capacities."  *Gean v. Hattaway*, 330 F.3d 758, 776 (6th Cir. 2003) (citing *Will v. Mich.*, 491 U.S. at 71).  Thus, to the extent that Plaintiff alleges claims against NKU pursuant to 42 U.S.C. § 1983, these claims are barred by the Eleventh Amendment.

Likewise, the Eleventh Amendment bars suit in federal court against a state and its agents acting in their official capacities brought pursuant to 42 U.S.C. § 1985(3).  *See, e.g.*, *Ferritto v. Ohio Dep't of Highway Safety*, 928 F.2d 404, No. 90-3475, 1991 WL 37824, at *2 (6th Cir. Mar. 19, 1991) (per curiam) (unpublished table decision) ("The Eleventh Amendment prohibits actions against states and state agencies under section 1983 and section 1985."); *Abe v. Mich. Dep't of Consumer & Indus. Servs.*, No. 99-1813, 2000 WL 1176878, at *1 (6th Cir. Aug. 9, 2000) (unpublished table decision) (holding that the defendant state agency "was immune under the Eleventh Amendment" to claim brought under § 1985).  District courts within the Sixth Circuit "routinely apply this rule to dismiss section 1985 claims against state agencies and officials."  *Rayyan v. Sharpe*, No. 1:08-cv-324, 2008 WL 4601427, at *4 n.5 (W.D. Mich. Oct. 15, 2008); *see, e.g.*, *Harper v. Ky. Dep't of Corr.*, No. 06-CV-170-HRW, 2007 WL 204002, at *1 (E.D. Ky. Jan. 24, 2007) (holding that "the Eleventh Amendment prohibits actions under § 1983 and § 1985 against states and state agencies"); *Cantu v. Mich. Dep't of Corr.*, No. 07-CV-10339, 2007 WL 2413103, at *5 (E.D. Mich. Aug. 21, 2007) ("[A] federal conspiracy claim under § 1985 is barred by Eleventh Amendment immunity . . . ."); *Moss v. Columbus Bd. of Educ.*, No. 2:00-CV-855, 2001 WL 1681117, at *9 (S.D. Ohio Sept. 27, 2001) (stating that "in enacting the § 1985

9

conspiracy statute, Congress did not abrogate the State's Eleventh Amendment immunity from suit") (citing *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1184 (7th Cir. 1982)).

This Eleventh Amendment immunity is extended to state officials and employees of the state agency acting in their official capacities.  Such suits against state officials are likewise barred because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and is therefore "no different from a suit against the State itself").  Thus, because the Eleventh Amendment bars these claims as against NKU, the state agency itself, it also bars suit on these claims against Defendants in their official capacities.  Accordingly, the federal claims brought against Defendants NKU, the NKU Board of Regents, and the individual Defendants in their official capacities pursuant to §§ 1983 and 1985 are barred by the Eleventh Amendment.

### 2.    State Law Claims

"The Supreme Court has squarely held that pendent state law claims against state officials in their official capacity are barred by the Eleventh Amendment."  *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520-21 (6th Cir. 2007) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117-21 (1984)).  This remains true "even though there would otherwise be supplemental jurisdiction."  *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000) (citing *Pennhurst*, 465 U.S. at 123).  Therefore, finding that NKU, the NKU Board of Regents, and the individual Defendants in

their official capacities are protected by Eleventh Amendment immunity, Plaintiff's state law claims as to these Defendants are dismissed, with the opportunity to bring such claims in state court subject to any available state law defenses. *See Experimental Holdings*, 503 F.3d at 521 (clarifying that the "Eleventh Amendment dismissal of pendent state law claims is properly 'with prejudice' to subsequent *federal court* suit, but it does not by itself preclude a *state court* suit from raising the same claims").

### 3.    Injunctive Relief

Immunity under the Eleventh Amendment does not necessarily bar claims seeking prospective injunctive relief against individual defendants in their official capacity.  In *Ex parte Young*, "the United States Supreme Court carved out an exception to Eleventh Amendment state immunity, stating that federal courts 'may enjoin state officials to conform their future conduct to the requirements of federal law.'"  *Bailey v. Montgomery*, 433 F. Supp. 2d 806, 810 (E.D. Ky. 2006) (quoting *Quern v. Jordan*, 440 U.S. 332, 337 (1979)); *see Ex Parte Young*, 209 U.S. 123 (1908).  Not all claims for prospective injunctive relief, however, are entitled to the *Ex parte Young* exception.  Plaintiff conceded at oral argument that he is not entitled to injunctive relief on these claims.  The Court agrees and, for the reasons set forth below, finds that injunctive relief is not warranted on these facts.

The Sixth Circuit addressed circumstances where this exception does not apply in *Gean v. Hattaway*, 330 F.3d 758 (6th Cir. 2003).  Although the plaintiffs in *Gean* styled their claim as one for prospective injunctive relief, the court concluded that "[t]heir complaint is . . . based entirely upon past acts and not continuing conduct that, if stopped, would provide a remedy to them, and it therefore does not come under the doctrine of *Ex Parte Young*." 330 F.3d at 776.  Relief intended to compensate an injured party for past violations of

federal law by a state official in his official capacity is barred by the Eleventh Amendment. This remains true when "the relief is tantamount to an award of damages for a past violation of federal law, even though styled as something else." *Papasan v. Allain*, 478 U.S. 265, 278 (1986).

The alleged violations of federal law complained of by Plaintiff in this suit occurred in the context of specific past events. Plaintiff additionally concedes that the "suspension was ultimately lifted." (Doc. # 9 at 7). Plaintiff has alleged no present, ongoing violations of his federal rights, nor any threat of such future violative conduct. Thus, Plaintiff's Amended Complaint does not adequately pray for "relief that serves directly to bring an end to a present violation of federal law" such that these claims may avoid application of the Eleventh Amendment. *Papasan*, 478 U.S. at 278. Accordingly, Plaintiff's claims against the individual Defendants in their official capacities pursuant to 42 U.S.C. §§ 1983 and 1985(3) are barred by the Eleventh Amendment, notwithstanding Plaintiff's prayer for injunctive relief.

**C.   Defendants are Entitled to Qualified Immunity on Plaintiff's Federal Claims to the extent they have been sued in their Individual Capacities.**

Qualified immunity shields officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This immunity is provided to officials in the performance of "discretionary functions." *Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006). It is undisputed that all relevant actions taken by Defendants on April 7, 2010 were discretionary in nature. Whether an official is protected by qualified immunity "turns on the 'objective legal

12

reasonableness' of his actions, assessed in light of the legal rules that were 'clearly established' at the time the actions were taken." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994) (quoting *Harlow*, 457 U.S. at 818-19).

Qualified immunity is not merely a defense to liability, but rather provides entitled officials with an "immunity from suit" altogether, shielding them from the burdens of discovery and costs of trial. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The purpose of this doctrine is to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818. To achieve this purpose, its protection is afforded to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). This broad grant of immunity is "intended to serve the public interest by permitting officials to take action 'with independence and without fear of consequences.'" *Crockett v. Cumberland Coll.*, 316 F.3d 571, 579 (6th Cir. 2003) (quoting *Harlow*, 457 U.S. at 819).

The Supreme Court articulated a two-part test in *Saucier v. Katz*, 533 U.S. 194 (2001) to determine whether a defendant is entitled to qualified immunity. Under this analysis, a court must determine: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."[5] *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11

---

[5] Some Sixth Circuit panels have expanded this analysis to include a third step, asking "'whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)); *see Causey v. City of Bay City*, 442 F.3d 524, 528 n.2 (6th Cir. 2006) (noting that "both the two-step approach and the three-step approach can be said to capture the holding of *Saucier v. Katz*"); *see also Sample v. Bailey*, 409 F.3d 689, 695-96, 696 n.3 (6th Cir. 2005) (concluding that the "three-step approach correctly encompasses the Supreme Court's approach to qualified immunity claims and serves to ensure government officials the proper protection from civil suit under the law"); *cf. Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (finding that in the context of an excessive force claim, where "the defendant's conduct must have been objectively

(6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. at 201); *see Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009).  In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236 (abandoning the mandatory nature of the *Saucier* framework, though acknowledging that "the sequence set forth there is often appropriate").  *Pearson* has been interpreted by the Sixth Circuit to mean that "'we are free to consider those questions in whatever order is appropriate in light of the issues before us,' such that we need not decide whether a constitutional violation has occurred if we find that the officer's actions were nevertheless reasonable."  *Jones v. Byrnes*, 585 F.3d, 971, 975 (6th Cir. 2009) (internal citations omitted) (quoting *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009), *amended and superseded by* 578 F.3d 351 (6th Cir. 2009)).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity."  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 970 (6th Cir. 2004)); *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (holding that assertion of qualified immunity shifts the "burden of proof [to] the plaintiff to show that the defendant[s] [are] not entitled to qualified immunity") (citing *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

---

unreasonable to find a constitutional violation, the third step is redundant") (internal citations omitted); *but see Dunigan v. Noble*, 390 F.3d 486, 491 n.6 (6th Cir. 2004) (declining to follow other Sixth Circuit panels that "have continued to rely on a three step analysis of qualified immunity claims").

### 1.     Federal Claims

#### a.     Section 1983[6]

_____

[6] The introductory paragraph of Plaintiff's Amended Complaint asserts an intent to bring suit against Defendants pursuant to § 1983 "for violation of his civil rights afforded to him under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794." (Doc. # 9 at 2). These statutes are not mentioned beyond this preamble, and a violation of either statute is never alleged in Plaintiff's stated claims. Even if the Court assumes that Plaintiff intended to implicate these two statutes in Claim 1 pursuant to § 1983, this attempt fails.

If Plaintiff is seeking to bring an ADA claim pursuant to § 1983 as suggested by his Amended Complaint, this claim was not properly brought. Section 1983 provides a remedy for violations of federal statutory and constitutional law, unless "the statute does not create 'enforceable rights, privileges, or immunities within the meaning of § 1983,' [or unless] 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Lochman v. Cnty. of Charlevoix*, 94 F.3d 248, 250 (6th Cir. 1996) (quoting *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990)). The Supreme Court has recognized that some federal statutes embody "a remedial scheme that is 'sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Wilder*, 496 U.S. at 521 (quoting *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981)); *see also Blessing v. Freestone*, 520 U.S. 329, 347-48 (1997) (describing the instances in which the Supreme Court had thus far "found a remedial scheme sufficiently comprehensive to supplant § 1983").

District courts within this circuit agree that the ADA provides a comprehensive remedial scheme such that violations of the ADA do not give rise to a separate claim under § 1983. *See, e.g., Westermeyer v. Ky. Dep't of Pub. Advocacy*, No. 2:10-131-DCR, 2011 WL 830342, at *7 n.1 (E.D. Ky. Mar. 3, 2011) (stating that the ADA provides a "comprehensive remedial scheme[] which create[s] the exclusive remed[y] for violations" of that statute); *Cole v. Taber*, 587 F. Supp. 2d 856, 863 (W.D. Tenn. 2008) (holding that "the ADA [is] independently actionable and [has a] comprehensive remedial scheme[]," such that violations "do[] not give rise to separate claims under § 1983"); *Porter v. Ellis*, 117 F. Supp. 2d 651, 652 (W.D. Mich. 2000) ("Even if Plaintiff had a colorable claim under the ADA, he could not use section 1983 as a conduit for that claim."). Section 1983 is not an appropriate vehicle for such a claim, and thus any claim Plaintiff intends asserting a violation of the ADA was not properly brought.

The law is unsettled as to whether § 1983 provides a right of action for a violation of Section 504 of the Rehabilitation Act, or whether, like the ADA, the remedies available under the Rehabilitation Act were intended by Congress to preclude a suit brought under § 1983. *See Gean v. Hattaway*, 330 F.3d 758, 775-76 (6th Cir. 2003). However, even if Plaintiff may bring such a claim through § 1983, it must still be dismissed as he has failed to allege, or provide support for, all of the required elements. These elements are: (1) that he is a handicapped person under the Act; (2) that he is "otherwise qualified" to participate in the program he alleges he was excluded from; (3) that he is "being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap"; and (4) that the relevant program is receiving federal funding. *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030-31 (6th Cir. 1995).

Significantly, Plaintiff has not alleged that any exclusion or denial effected by Defendants was "solely by reason of his handicap." Plaintiff alleges in his Response that "[b]ad faith can be found by the Defendants when they singled the Plaintiff out simply because, as a disabled student, he was acting unusual." (Doc. # 11-1 at 4). The undisputed facts presented require a contrary finding. Plaintiff's behavior raised concerns when considered by Defendants both objectively, and in light of Plaintiff's usual conduct. Sgt. Love received a call from TDS expressing concern because Plaintiff was behaving abnormally, taking into account his disability, and believed he may be under the influence of a controlled substance. This evaluation was made with the knowledge of what constitutes Plaintiff's normal or typical behavior. Lisa Besnoy, Director of TDS, informed Sgt. Love that she "has had previous contact with [Plaintiff] and stated that his past behavior was always pleasant and alert." (Doc. # 10-1 at 2). These facts suggest that Plaintiff was further observed and subsequently questioned, not because he was disabled or because he failed to act in strict conformity with

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)); *see* 42 U.S.C. § 1983. The parties do not dispute that Defendants were acting under color of state law at all relevant times. Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

Plaintiff asserts that he is entitled to damages under § 1983 "for the injuries set for [sic] above for violation of his constitutional, due process and statutory rights under color of law," and that "[t]he Defendants, while engaging in the conduct described above, deprived the Plaintiff of his 5th and 14th Amendment rights." (Doc. # 9 at 7-9; Counts I and VI).[7] Defendants argue that "[b]ecause Plaintiff has only identified his due process rights

---

other non-disabled students, but rather because Plaintiff's actions were abnormal, were not characteristic of his own usual behavior, and Defendants believed a controlled substance to be involved. Regardless of the reason that he was initially observed and "singled out," Plaintiff was further evaluated and subsequently suspended because his unexplained conduct raised concern for his own safety and that of the NKU community. Furthermore, upon confirmation from Plaintiff's psychologist that he did not pose a danger to himself or others, although he continued to manifest certain unusual behaviors as a result of his disability, the suspension was lifted. Therefore, Plaintiff has failed to bring a colorable claim under § 504 of the Rehabilitation Act.

[7] As previously stated, *see supra* note 4, Count VI of the Amended Complaint, alleging violations of Plaintiff's 5th and 14th Amendment due process rights, will be analyzed here as brought pursuant to § 1983, as these amendments, in and of themselves, do not create a private right of action. *See Butz v. Economou*, 438 U.S. 478, 526 (1978) (Rehnquist, J., concurring in part and dissenting in part) (noting that "the Court has not held that the Constitution itself creates a private right of action for damages except when federal law enforcement officials arrest someone and search his premises in violation of the Fourth Amendment").

as the violated right, the analysis should start and stop there."   (Doc. # 10-1 at 9).

Defendants further assert that the only action identified in Plaintiff's Amended Complaint

that relates to due process is the imposed interim suspension.  (*Id.*).  Plaintiff confirmed at

oral argument that he is only alleging that his due process rights were violated, and not any

other constitutional right.

### i.   Defendants' Actions Did Not Violate Plaintiff's Clearly Established Substantive or Procedural Due Process Rights

In Plaintiff's written filings, he only claims that Defendants failed to provide adequate

due process when imposing his suspension.  (*See* Docs. # 9; 11-1 at 3-4).  However, at

oral argument, Plaintiff argued that Defendants' actions violated both his substantive and

procedural due process rights.  The Due Process Clause of the Fourteenth Amendment

prohibits states from depriving "any person of life, liberty, or property, without due process

of law."  U.S. Const. amend. XIV, § 1.  This Clause endows individuals with the right to both

substantive and procedural due process.  *Prater v. City of Burnside*, 289 F.3d 417, 431 (6th

Cir. 2002) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

In determining whether Defendants are entitled to qualified immunity on Plaintiff's

due process claims, the Court must consider whether each individual Defendant violated

Plaintiff's clearly established due process rights.  Defendants argue that "[a] reasonable

official could clearly determine that the suspension at issue would not violate any

constitutional right."  (Doc. # 10-1 at 10).  Defendants contend that the undisputed facts do

not establish that the violation of a constitutional right occurred, but that even if such a

violation did occur, "the right was not 'clearly established,'" and thus Defendants are entitled

to the protections of qualified immunity.  (Doc. # 12 at 4) (citing *McGee v. Schoolcraft Cmty.*

17

*Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006) (unpublished) ("The issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved.")).  In his Response, Plaintiff argued only that Defendants acted in bad faith and are therefore not entitled to the protections of qualified immunity.[8]  In doing so, however, he failed to articulate how Defendants' conduct violated a clearly established constitutional or statutory right.  "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

### a.  Substantive Due Process

"The doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed has come to be known as substantive due process."  *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992).  The guarantees of Substantive Due Process "prevent[] the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'"  *Salerno*, 481 U.S. at 746 (internal citations omitted); *see Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003) ("Interests protected by

---

[8]  Plaintiff's unsupported allegations that Defendants acted in "bad faith" are not relevant to the qualified immunity inquiry.  The only argument that Plaintiff advances to overcome Defendants' assertion of qualified immunity is his contention that "Defendants are not entitled to immunity if they acted in bad faith." (Doc. # 11-1 at 3).  In fact, Plaintiff's only reference to due process in his Response is made in the context of this argument, stating that "[b]ad faith can also be found when the Defendants suspended the Plaintiff without adequate due process."  (*Id.* at 3-4).  Although the qualified immunity inquiry once embodied both objective and subjective components, *Gomez v. Toledo*, 446 U.S. 635, 641 (1980), the subjective factor requiring "good faith" is no longer relevant.  In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court "rejected the inquiry into the state of mind in favor of a wholly objective standard."  *Davis v. Scherer*, 468 U.S. 183, 191 (1984).  Therefore, Plaintiff's reliance on bad faith to refute Defendants' entitlement to qualified immunity is misplaced.

substantive due process . . . include those protected by specific constitutional guarantees, . . . freedom from government actions that 'shock the conscience,' and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.") (internal citations omitted) (citing *Braley v. City of Pontiac*, 906 F.2d 220, 224-25 (6th Cir. 1990)).  To the extent that Plaintiff is alleging a substantive due process claim, he has not presented evidence to demonstrate that he was deprived of any fundamental right or constitutional guarantee, nor has he demonstrated that any actions taken by Defendants rise to the level of the applicable "shocks the conscience" standard.

Plaintiff has not specified which fundamental right, protected by substantive due process, Defendants allegedly violated.  Despite this failure, the Court assumes Plaintiff is alleging that he was deprived of the right to continued enrollment at NKU free from arbitrary suspension.  *See Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985) (defining the substantive right at issue as "continued enrollment free from arbitrary state action," specifically arbitrary dismissal); *cf. Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) ("In the context of school discipline, a substantive due process claim will succeed only in the 'rare case' when there is 'no rational relationship between the punishment and the offense'") (quoting *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989)).  Plaintiff has presented no support to demonstrate that this right is a fundamental right protected by substantive due process.  The Supreme Court, as well as the Sixth Circuit, have abstained from deciding whether an interest in continued enrollment free from arbitrary state action is protected by substantive due process.  *See Ewing*, 474 U.S. at 222-23; *Bell*, 351 F.3d at 251.  Rather, when confronted with this issue, these Courts have merely assumed that such a substantive right exists, and ultimately held that the assumed right was not violated

19

by the student's dismissal.  *Id.*

The Court follows the guidance of the Supreme Court and the Sixth Circuit and assumes, *arguendo*, that Plaintiff's interest in continued enrollment free from arbitrary suspension is subject to the protections of substantive due process.  Plaintiff has presented no evidence to establish that Defendants' actions taken in suspending him were arbitrary or unreasonable such that they violated this substantive right.  To the contrary, the facts disclosed in the record require the Court to reach the opposite conclusion.

The record demonstrates that Defendants acted reasonably in finding that Plaintiff's documented behavior caused "reasonable apprehension" of physical or emotional harm and thus warranted a temporary suspension.  The undisputed facts reflect that the observation and evaluation of Plaintiff's behavior was a measured and deliberate process.  After initial concern from TDS employees, NKU Police were notified.  Rather than approaching Plaintiff immediately, Sgt. Love observed Plaintiff for an appreciable period before making contact with him.  After engaging in conversation with Plaintiff, Sgt. Love had concerns that Plaintiff was experiencing mental health issues.  He then requested personnel from NKU counseling services to provide an assessment.  The counseling service employee opined that Plaintiff was experiencing mental health issues which may require further attention.  Defendants then contacted Plaintiff's mother, whereupon she notified them that Plaintiff had recently seen a counselor, was taking medication, and had exhibited a recent change in behavior.[9]

---

[9]  Plaintiff asserted at oral argument that his mother's statements to Sgt. Love that Plaintiff has exhibited a recent change in behavior were taken out of context.  Plaintiff clarified that these statements were made in fear that Plaintiff was going to be arrested, and that she was merely referring to Plaintiff's recent sleeplessness and increased anxiety level.  Even Plaintiff's own assertions acknowledge that his mother *did* notice a recent change in his behavior.  Moreover, whether or not Plaintiff's mother actually believed that his

Plaintiff argues that "what actually happened in the Testing and Disability Center of [NKU] on April 7, 2010" remains in dispute, and is a material fact sufficient to preclude summary judgment. (Doc. # 11-1 at 3). The Court disagrees. To the extent that there may be a dispute, it is not material. Plaintiff has not contested any of the conduct or communication as reported by Sgt. Love, but only the context in which some statements were made, and the assertion that the documented conduct differed from his usual conduct. Even assuming that discovery would reveal that Plaintiff's behavior was not significantly different than it was on any other day, Defendants took reasonably calculated steps to evaluate this behavior before arriving at the determination that an interim suspension pending further professional evaluation was warranted. That Plaintiff contends his behavior on this day was not unlike his usual behavior does not preclude a finding that the conduct reasonably caused concern, specifically "reasonable apprehension" of "physical or emotional harm" to Plaintiff himself or to others, as stated in the letter from Dean Waple. (Doc. # 10-2 at 6). Furthermore, the report of Dr. Hoersting, Plaintiff's own treating psychologist, confirmed that Plaintiff "has adopted some new compulsive behaviors that certainly appear odd and *may be viewed with apprehension by others.*" (Ex. 1 at 2-3) (emphasis added). Upon receipt of this report, which also opined that Plaintiff presented no "significant risk" of harm to himself or others, the charges were dropped and the suspension lifted. The facts therefore establish that Defendants did not act unreasonably or arbitrarily in temporarily suspending Plaintiff pending further investigation, and thus

---

behavior had recently changed, this was the information she provided to the Defendants, and the information that they relied on. Thus, Plaintiff's mother's subjective motivation in making the statements to Sgt. Love is immaterial to the determination that Defendants acted reasonably in reliance thereon.

Defendants' actions in doing so did not deny Plaintiff the protections of substantive due process.

Plaintiff has also failed to establish a violation of his substantive due process rights resulting from governmental action which "shocks the conscience." In fact, no such action has been alleged. Although Plaintiff never explicitly states what conduct of Defendants is implicated by this substantive due process claim, the Court will address the actions that Plaintiff alleges were taken by Defendants in bad faith. (*See* Doc. # 11-1 at 3-4). Plaintiff makes much of the fact that one of the defendants "misled" Plaintiff to induce him to talk by informing him that his mother was on her way, when she was not in fact called until an hour later. (Doc. # 11-1 at 4). Plaintiff additionally highlights that he was physically prevented from leaving the testing room without being charged with a crime, and that he was accompanied when going to the restroom. (*Id.* at 3). Plaintiff also states that Defendants "singled the Plaintiff out simply because, as a disabled student, he was acting unusual." (*Id.* at 4). Despite these conclusory allegations, Plaintiff has presented no factual support to suggest that any of these actions were actually taken in bad faith, rather than in a reasonable effort to ensure the safety of Plaintiff and others.

Not only does Plaintiff fail to show the existence of bad faith, Defendants' actions as alleged by Plaintiff fall well short of "conduct that shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). None of the actions alleged are so egregious that they are "bound to offend even hardened sensibilities." *Id.*; *see Simon v. Cook*, 261 F. App'x 873, 881 (6th Cir. 2008) (unpublished) ("To shock the conscience, conduct must have been 'so brutal and offensive that it did not comport with traditional ideas of fair play and decency.") (quoting *Breithaupt v. Abram*, 352 U.S. 432, 435-36 (1957) (finding that

22

"due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct")).  To the contrary, these actions were taken by Defendants in the course of a reasonable evaluation of Plaintiff, as explained above, to ensure the safety of Plaintiff and others on the NKU campus.[10]  Plaintiff has thus failed to allege conduct of any Defendant which "shocks the conscience," and thereby violates his substantive due process rights.

Plaintiff contends that additional material facts remain in dispute which preclude summary judgment on this claim.  Specifically, Plaintiff states that a genuine dispute exists as to whether the NKU personnel acted unreasonably under the circumstances and in bad faith toward Plaintiff.  (Doc. # 11-1 at 3).  Plaintiff has presented no evidence nor alleged any facts to support either of these contentions.  Accordingly, because Plaintiff has failed to demonstrate that any of the Defendants "engag[ed] in conduct that shocks the conscience . . . or interfere[d] with rights implicit in the concept of ordered liberty," *United States v. Salerno*, 481 U.S. 739, 746 (1987), he has not established that his constitutional right to substantive due process was violated, and Defendants are entitled to qualified immunity on this claim.

### b.    Procedural Due Process

Plaintiff alleges that his right to procedural due process was violated when he was suspended without adequate process.  (Doc. # 11-1 at 3-4).  "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or

---

[10]  Had Defendants taken no action, and Plaintiff harmed others or himself, Defendants could have potentially been exposed to liability for their inaction.

'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 331 (1976).  To prevail on a procedural due process claim, a plaintiff must first establish the existence of a constitutionally protected life, liberty, or property interest.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569-70 (1972).  The Sixth Circuit has found that a protectable interest exists in the continued enrollment at a post-secondary educational institution, holding that "the Due Process Clause is implicated by higher education disciplinary decisions."  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (citing *Jaksa v. Regents of the Univ. of Mich.*, 597 F. Supp. 1245 (E.D. Mich. 1984) (finding due process clause implicated in suspension from university for cheating), *aff'd*, 787 F.2d 590 (6th Cir. 1986)); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) (stating that, in the context of a university student suspension, it is "not questioned that a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property"); *see Goss v. Lopez*, 419 U.S. 565, 575-76 (1975) (finding liberty and property interests implicated in high-school suspension); *but see McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006) (unpublished) (finding that "[t]he issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved").  Plaintiff must then establish that he was "deprived" of that protectable interest without due process of law.  *Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82 (1978).

"Once it is determined that due process applies, the question remains what process is due."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "Notice and an opportunity to be heard remain the most basic requirements of due process."  *Flaim*, 418 F.3d at 635;

24

*Mathews*, 424 U.S. at 348 ("The essence of due process is the requirement that a person in jeopardy of serious loss [be given] notice of the case against him and an opportunity to meet it.").  The general framework for evaluating the amount of process required under the Due Process Clause was defined by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  The framework set forth in *Mathews* calls for the consideration of three factors: (1) the private interest affected; (2) the danger of error and the likely benefit of additional or alternate procedural safeguards; and (3) the public or governmental interest, including the burden that additional procedure would entail.  *Id.* at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-71 (1970)).  The process required therefore varies according to the facts and circumstances of each case.  *Id.* at 334-35.

"'[D]ue process is flexible and calls for such procedural protections as the particular situation demands.'"  *Mathews*, 424 U.S. at 334 (quoting *Morrisey*, 408 U.S. at 481).  The amount of process that is required depends upon the weight of the governmental and private interests affected.  *Id.*  Thus, the process afforded to a student depends upon the nature and weight of the action taken.  A disciplinary action, as opposed to an academic one, requires the court to conduct a "more searching inquiry."  *Flaim*, 418 F.3d at 634 (citing *Horowitz*, 435 U.S. at 86 (noting that "far less stringent procedural requirements [are necessary] in the case of an academic dismissal")).  Courts have additionally recognized that the private interest affected by a temporary suspension is "minimal" compared to an expulsion, and therefore fewer procedural protections are required under the *Mathews* framework.  *Nguyen v. Univ. of Louisville*, No. 3:04CV-457-H, 2006 WL 1005152, at *4 (W.D. Ky. Apr. 14, 2006) (citing *Flaim*, 418 F.3d at 638 (recognizing "the lifelong impact that expulsion can have on a young person"); *see Goss v. Lopez*, 419 U.S. 565, 576 (1975) ("A

25

short suspension is, of course, a far milder deprivation than expulsion.").

In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court specifically defined the procedural requirements for a student faced with a temporary disciplinary suspension of up to ten days. The process "due" in such a case requires that "the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The Court added that "[i]n the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.* at 582. To provide the student with the "opportunity to explain his version of the facts," he should be informed of the accusation against him and the basis for such accusation. *Id.* The Court concluded that even in the context of "an informal give-and-take between student and disciplinarian," these requirements can be met as the student would be able to "characterize his conduct and put it in what he deems the proper context." *Id.* at 584.

The Court assumes, for the purpose of this analysis, that Plaintiff's interest in continued enrollment at NKU is subject to the protections of due process. Plaintiff contends that he was deprived of that interest through the imposition of an interim suspension. Whether that deprivation resulted in a constitutional violation, however, depends upon whether Plaintiff was afforded sufficient process in connection with such deprivation. In determining what procedural protections Plaintiff was constitutionally entitled to, the Court must address a threshold question: whether the sanction imposed on Plaintiff is properly defined as a two-day suspension or an indefinite suspension. This distinction is not addressed by the parties. Although the Court finds that the suspension is properly characterized as a two-day suspension governed by the clearly established requirements

26

of *Goss*, both types of suspension will be addressed in turn.

## Short-Term Suspension

Plaintiff conceded at oral argument that his suspension and exclusion from the NKU campus lasted only two days. He did not contest the characterization of the suspension as short-term, and did not challenge that the only process he was constitutionally entitled to was the basic requirements of notice and an opportunity to be heard as defined in *Goss* for a suspension of that length. The first prong in determining whether Defendants are entitled to qualified immunity on this claim requires Plaintiff to demonstrate that a constitutional right has been violated. The procedural protections afforded to Plaintiff met the basic requirements of *Goss*, and therefore Defendants did not violate Plaintiff's constitutional right to due process.

### *Plaintiff was Provided with Notice*

"'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'" *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (quoting *Baldwin v. Hale*, 1 Wall. 223, 233 (1864)). "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice . . . ." *Id.* at 581. Notice was provided to Plaintiff and his mother both orally and in writing. Plaintiff was made aware before leaving the NKU campus on the day in question that he was being placed on interim suspension as a result of his abnormal behavior in the testing room. The police report attached to Defendants' Motion provides the details of this oral notice. (*See* Doc. # 10-2 at 3-4). Plaintiff was additionally provided with a letter from the NKU Dean of Students, Jeffrey Waple, placing him on "interim suspension . . . pending

an investigation," quoting the sections of the NKU student code which Plaintiff was charged with violating. (Doc. # 10-2 at 6-7).

Plaintiff never disputes that he received such notice, rather he contends that his right to procedural due process was violated because the notice he received was "faulty." Plaintiff argues that the notice provided was inadequate because he "was never informed as to the alleged behaviors that led to such suspension." (Doc. # 9 at 7). He reiterated at oral argument that neither he nor his mother were ever notified as to what specific conduct gave rise to his suspension. This argument does not comport with the unchallenged record evidence. In Sgt. Love's report, he specifically indicated that he discussed Plaintiff's abnormal behavior with him during their initial encounter in the testing room. (Doc. # 10-2 at 3-4). Sgt. Love also reported that he spoke with Plaintiff's mother, and that she indicated that she had similarly noticed a recent change in Plaintiff's behavior. (*Id.* at 4). Drawing all reasonable inferences in favor of Plaintiff, the content of the conversations, in conjunction with the written letter, are sufficient to apprise Plaintiff of the conduct giving rise to the charges set forth in the letter of suspension.

Plaintiff asserted at oral argument that if he were permitted to testify, he would state that his behavior on the day in question was not a deviation from his usual behavior, and thus did not justify the charges brought in his letter of suspension. This line of reasoning indicates that Plaintiff's argument is not that he was never informed of the basis for the charges, but rather an argument that his documented behavior was not severe enough to constitute a violation of the provisions he was charged with in the suspension letter. This argument is simply not relevant to whether the notice provided was adequate.

28

That Plaintiff and his mother disagreed with NKU officials' conclusion that Plaintiff's behavior justified the charges and interim suspension does not direct a finding that the notice itself was inadequate.  This objection is precisely the kind that should be raised in the course of exercising his opportunity to be heard.  "Notice satisfies due process if the student 'had sufficient notice of the charges against him and a meaningful opportunity to prepare for the hearing.'"  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005) (quoting *Jaksa v. Regents of the Univ. of Mich.*, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984)).  Plaintiff was given notice of the charges against him, and the conduct that gave rise to those charges.  The notice requirements as set forth in *Goss* may be satisfied upon oral notice alone.  419 U.S. at 584.  The oral and formal written notice provided to Plaintiff here exceeds these minimum requirements.  A mere disagreement with the conclusions reached within the notice does not raise a material question as to its constitutional sufficiency, and thus does not preclude summary judgment.

### Plaintiff was Provided an Opportunity to Be Heard

Plaintiff does not contest that he was provided with a constitutionally sufficient opportunity to be heard.  Plaintiff was provided with an informal opportunity to be heard prior to the imposition of suspension.  The conversation between Plaintiff and Sgt. Love, and other various NKU personnel, prior to his suspension embodied the informal "give-and-take" contemplated by the Supreme Court in *Goss.*  According to the report of Sgt. Love, Plaintiff was told that he was being questioned as a result of his abnormal behavior, and was asked to provide a response or reason for such behavior.  It was this opportunity to present his side of the story and Plaintiff's curious responses that further enhanced the Defendants' concern.  Plaintiff has not disputed the conduct or communications as set forth

by Defendants, nor provided an alternate version of the events that occurred, but only argues that his statements were taken out of context.  This contention does not detract from the fact that Defendants provided Plaintiff with an opportunity to explain his conduct, and he failed to adequately dispel Defendants' concerns in doing so.  Moreover, Plaintiff has not alleged that he or his mother ever denied the charges set forth in the letter of suspension at the time it was received, nor raised any objection to the validity of the concerns voiced by Defendants at the time of the incident.  To the contrary, the report of Sgt. Love stated that Plaintiff's mother confirmed that she, too, had "noticed a recent change in his behavior."  (Doc. # 10-2 at 4).

According to Plaintiff's letter of suspension, a formal opportunity to be heard and present objections was also scheduled to occur after further assessment of Plaintiff's mental health.  The suspension letter stated that upon NKU's receipt of Plaintiff's mental health evaluation results, a "formal administrative meeting" would be held to evaluate Plaintiff's responsibility for the alleged violations. (Doc. # 10-2 at 7).  However, the findings of Dr. Hoersting's evaluation rendered any further hearing unnecessary, and Plaintiff concedes that the suspension was lifted only two days after it was imposed.

The undisputed facts taken in the light most favorable to Plaintiff demonstrate that he was provided with at least the notice and opportunity to be heard mandated by the minimum procedural requirements for a temporary suspension set forth in *Goss*.  Thus, Defendants' actions in suspending Plaintiff did not violate his constitutional right to due process.  Finding that no constitutional violation occurred, it is unnecessary to address whether Plaintiff's constitutional right was clearly established, and Defendants are entitled to qualified immunity on Plaintiff's procedural due process claim.

## Long-Term Suspension

Alternatively, the action taken by Defendants can be framed as an indefinite suspension.  Although the suspension at issue ultimately lasted only two days, this duration was not defined at its imposition.  At the time Plaintiff was placed on interim suspension, his ability to return to campus was subject to a later determination to be made subsequent to a formal hearing.  (*See* Doc. # 10-2 at 6-7).  Plaintiff has made no attempt to characterize the nature of his suspension, or the weight of that deprivation on his interest in continued enrollment.  In failing to do so, he has also not suggested that the suspension at issue here required more than basic notice and opportunity to be heard.  However, even if the Court took the view that the suspension imposed was more severe, and thus required heightened procedural protections, Defendants are entitled to qualified immunity because they did not violate a clearly established right.

### The Amount of Process Constitutionally Required in Conjunction with a Long-Term Suspension is Not Clearly Established

Defendants are entitled to qualified immunity if adequate process was provided in conjunction with Plaintiff's suspension such that it did not result in a violation of Plaintiff's clearly established rights.  Under the circumstances presented here, it is appropriate to address the second prong of the qualified immunity analysis first and consider whether the right allegedly violated was clearly established.  The Supreme Court stated in *Anderson v. Creighton*, 483 U.S. 635 (1987) that the right should not be defined broadly, but rather "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be

sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 639-40.  The Court provided the example that "the right to due process of law is quite clearly established by the Due Process Clause . . . [b]ut if the test of 'clearly established law' were to be applied at this level of generality it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*." *Id.* at 639.  A reasonable official would understand that his actions constitute a violation of a constitutional right, and thus it may be considered clearly established, where: (1) "the violation was sufficiently 'obvious' under the general standards of constitutional care," or (2) "where the violation is shown by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case.'" *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 599-600 (2004)).  It is certainly not "obvious" that any constitutional violation occurred.  Defendants have adhered to the body of law that exists governing due process in disciplinary cases generally, and no precedent has been shown that "squarely governs the case here." *Brosseau*, 543 U.S. at 600.

Although the Supreme Court has clearly defined the process that must be afforded to a student facing a short-term suspension of ten days or less, *Goss v. Lopez*, 419 U.S. 565 (1975), the Court has not similarly defined what process is due for indefinite suspensions except to state that "longer suspensions or expulsions . . . may require more formal procedures." *Id.* at 584.  The Sixth Circuit likewise has not decided this issue with any certainty, except to agree that a right to something more than basic notice and opportunity to be heard may be required under such circumstances.  *See Newsome v. Batavia Local Sch. Dist.*, 842 F.2d 920, 923-24 (6th Cir. 1988) (considering the adequacy

32

of pre-expulsion procedures "[w]ithout the aid of Supreme Court authority directly on point"); *Doe v. Bd. of Educ. Of Elyria City Sch.*, 149 F.3d 1182, No. 96-4008, 1998 WL 344061, at *4 (6th Cir. May 27, 1998) (unpublished table decision) (finding that long-term suspensions require more formal process, but acknowledging that "the Supreme Court has not definitively answered the question of what process is due" in such cases).   Other circuits agree that "[b]eyond the right to notice and hearing, the span of procedural protections required to ensure fairness becomes uncertain, and must be determined by a careful weighing or balancing of the competing interests implicated in the particular case." *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 14 (1st Cir. 1988); *see also Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) ("The Supreme Court has not answered the question of what, if any, additional process is required for a long-term suspension or expulsion."); *Palmer v. Merluzzi*, 868 F.2d 90, 95-96 (3d Cir. 1989) (finding that although the student's interest affected was "slightly greater" than a ten day suspension, a balancing of interests demonstrated that "the process required by *Goss* was sufficient").

### *An Objectively Reasonable Official Would Conclude that the Process Provided to Plaintiff Was Constitutionally Sufficient*

When a student is faced with a suspension lasting longer than ten days, more formal process may be required.  *See Goss*, 419 U.S. at 584.  The Sixth Circuit has instructed that where a student's interest in continued enrollment is deprived by action more severe than a short-term suspension, a court must refer to "the more general rubric of *Mathews*" to determine what process is required.  *See Newsome*, 842 F.2d at 923-24 (reviewing pre-expulsion procedures) (citing *Mathews*, 424 U.S. at 334-35).  The Sixth Circuit has noted

33

that although the analysis in *Goss* was limited to short-term suspensions, "it nevertheless establishes the *minimum* requirements for long-term expulsions as well." *Newsome*, 842 F.2d at 927. As explained in more detail above, Plaintiff was provided with notice and an opportunity to be heard. What further process, if any, Plaintiff was constitutionally entitled to depends on a balancing of the interests involved.

The Court assumes that Plaintiff's interest in continued enrollment, particularly when facing an indefinite suspension, is important. *See Goss v. Lopez*, 419 U.S. 565, 576 (1975) (noting that charges of misconduct, if sustained, "could seriously damage [a student's] standing with [his] fellow pupils and [his] teachers as well as interfere with later opportunities for higher education and employment"). Defendants, however, were also acting to further an important interest. Defendants acted to ensure the immediate safety of Plaintiff as well as the NKU community. As previously stated, the basic requirements of notice and an opportunity to be heard were met prior to Plaintiff's suspension. Defendants alerted Plaintiff to their worries, and provided him with an informal opportunity to dispel those concerns, which he failed to do. The use of further *pre*-deprivation procedural safeguards was not practical under these circumstances; To allow Plaintiff to remain on campus unsupervised pending further investigation and a formal hearing would frustrate Defendants' interest in ensuring the safety and protection of Plaintiff and others on the NKU campus. It is not clearly established what additional formal procedure these interests demand, though case law suggests that a formal hearing may be required.

Additional formal procedural protections, including a formal hearing, were scheduled to be provided to Plaintiff in his written letter of suspension, and were to take place before the charges against him were sustained or his removal from NKU became permanent. The

Fifth Circuit broadly defined the notice and hearing required in cases of student *expulsion* from college in *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5th Cir. 1961), *cert. denied*, 368 U.S. 930 (1961). The court found that "[a] hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved." *Id.* at 159. This type of formal hearing was offered here. The letter from Dean Waple provided for "a formal administrative meeting . . . to determine if [Plaintiff is] responsible for the alleged violations stated above and if [he] will be allowed to return to campus." (Doc. # 10-2 at 7). The hearing was to be conducted in conformance with detailed "procedure guarantees" as listed in the Code of Student Rights and Responsibilities. (*See* Doc. # 10-2 at 8-9). It is significant that these additional formal procedures never took place because they were rendered unnecessary when the charges were dropped and the suspension lifted after only two days.

Plaintiff has failed to allege what procedural protections were constitutionally required under these circumstances, or articulate what more Defendants should have done to meet these requirements. Nor has Plaintiff presented any case law which requires more process than what was provided. The body of case law governing this area dictates a result that "depends very much on the facts of each case," and there is no precedent that "squarely governs the case here." *Brosseau*, 543 U.S. at 600. A reasonable official could determine that the notice and opportunity to be heard provided constituted sufficient process under the circumstances, and thus that Plaintiff's constitutional rights were not violated. Thus, to the extent that Plaintiff had a constitutional right to process beyond that provided by Defendants, that right was not clearly established.

Accordingly, Plaintiff has failed to demonstrate that Defendants' conduct violated any clearly established due process right to which he was entitled, and thus Defendants in their individual capacities are entitled qualified immunity.  Therefore, summary judgment is granted in favor of the individual Defendants as to Plaintiff's substantive and procedural due process claims brought pursuant to § 1983.

### b.    Section 1985(3)

Plaintiff's claim of conspiracy pursuant to § 1985(3) is similarly vague.  This section of the United States Code is only referred to in the opening paragraph of Plaintiff's Amended Complaint in conjunction with K.R.S. § 344.280 and the description "conspiracy to deprive him of his civil rights."  (Doc. # 9 at 2).  Under Count II, Plaintiff alleges that "[t]he Defendants, working in concert with one another and acting under color of law, conspired to deprive the Plaintiff of his constitutional, due process and statutory rights."  (Doc. # 9 at 8).  Plaintiff makes only generalized legal conclusions, failing to specify which Defendants were involved, what specific rights these violations entail, or which facts provide support for this claim.  A § 1985 claim "'must be pled with some degree of specificity.'"  *Pahssen v. Merrill County Sch. Dist.*, 668 F.3d 356, 368 (6th Cir. 2012) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)).  "'[V]ague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim.'"  *Id.* (quoting *Gutierrez*, 826 F.2d at 1538-39).

To demonstrate an actionable claim of conspiracy pursuant to § 1985(3), a plaintiff must prove:

(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that

36

causes injury to person or property, or a deprivation of a right or privilege of a United States citizen.

*Collyer v. Darling*, 98 F.3d 211, 233 (6th Cir. 1996).  Significantly, a § 1985(3) conspiracy requires that the complaint "allege both a conspiracy and some 'class-based discriminatory animus behind the conspirators' action.'"  *Newell v. Brown*, 981 F.2d 880, 886 (6th Cir. 1992) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)); *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999) (holding that to state a cause of action under § 1985, a plaintiff must allege that "the conspiracy was motivated by racial, or other class-based, invidiously discriminatory animus").  Plaintiff has presented no evidence, nor alleged a sufficient factual basis, to suggest that the Defendants were engaged in a conspiracy.  Even if Plaintiff's Amended Complaint sufficiently pled the existence of a conspiracy, the complaint additionally fails to allege that Defendants "entered the conspiracy 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws.'"  *Pahssen*, 668 F.3d at 368 (quoting *Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2003)).  Moreover, Plaintiff has presented no facts that could be construed as demonstrating such a discriminatory objective behind Defendants' conduct.[11]  Thus, Plaintiff has not stated a cognizable claim of conspiracy pursuant to § 1985(3), and

_____

[11] In his Response, Plaintiff argues that Defendants are not entitled to qualified immunity, alleging that "[b]ad faith can be found by the Defendants when they singled the Plaintiff out simply because, as a disabled student, he was acting unusual."  (Doc. # 11-1 at 4).  This is the first and only instance in which Plaintiff specifically asserts that Defendants' conduct was related to Plaintiff's disabled status.  This single allegation still does not adequately suggest that Plaintiff's disability was a motivating factor behind any conduct allegedly in violation of Plaintiff's rights.  Rather, it suggests that Plaintiff's behavior is what initially attracted the Defendants' attention and caused them to further observe and evaluate Plaintiff.

In his description of Defendant Sween, Plaintiff states that "[u]nder her advise, the other Defendants discriminatively profiled the Plaintiff thereby causing him harm."  (Doc. # 9 at 4).  This comment likewise does not sufficiently allege the existence of any animus, nor that Defendants' subsequent actions were motivated by any discriminatory purpose.  Furthermore, to the extent that Plaintiff argues he *has* sufficiently alleged a shared discriminatory objective, he has provided no factual basis whatsoever to support such allegations.

as such has failed to show that Defendants violated a clearly established right. Therefore, Defendants are entitled to qualified immunity on Plaintiff's claim of conspiracy brought pursuant to § 1985(3).

### 2. State Law Claims

Plaintiff additionally asserts a number of claims arising under Kentucky state law. However, it is unnecessary for the Court to address the merits of summary judgment with respect to these claims. "'Under 28 U.S.C. 1367(c)(3), the district court may decline to exercise supplemental jurisdiction over a claim if it has dismissed all claims over which it has original jurisdiction. If the federal claims are dismissed before trial, the state claims generally should be dismissed as well.'" *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (quoting *Wojnicz v. Davis*, 80 F. App'x 382, 384-85 (6th Cir. 2003)); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); *Gaff v. FDIC*, 814 F.2d 311, 319 (6th Cir. 1987) ("It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise pendent jurisdiction over state law claims."). Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's Kentucky state-law claims against Defendants in their individual capacities.

38

### III.  CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that:

1.      Defendants', NKU, the NKU Board of Regents, James Votruba, Zebulun Davenport, Lisa Rhine, Jeffrey Waple, Steve Meier, Barbara Sween, Lisa Besnoy, Harold Todd, four Jane Does, employees of NKU, and two John Does, members of the NKU Police Department, Motion for Summary Judgment (Doc. # 10) is hereby **GRANTED**;

2.      Plaintiff's federal claims are hereby **DISMISSED WITH PREJUDICE**, and Plaintiff's pendent state-law claims are hereby **DISMISSED WITHOUT PREJUDICE**;

3.      This matter is hereby **STRICKEN** from the active docket of the Court; and

4.      A judgment in favor of Defendants will be entered contemporaneously herewith.

This 3rd day of May, 2012.



Signed By:
*David L. Bunning* DB

**United States District Judge**

G:\DATA\Opinions\Covington\2011\11-65 MOO Granting MSJ.wpd